Victor J. Sandoval
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd. Suite 1121
Los Angeles, California 90034
(562) 534-5907
victor@almeidalawgroup.com
*Counsel for Plaintiffs and the Putative Classes*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NICKI APAYDIN *and* KRISTY WILCE, *individually and on behalf of all others similarly situated,*<br><br>Plaintiffs,<br><br>vs.<br><br>TABOOLA, INC.,<br><br>Defendant. | Case No.: 2:26-cv-09707<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Nicki Apaydin, on behalf of herself and a class of all others similarly situated, hereby alleges the following against Taboola, Inc. ("Taboola" or "Defendant") based on personal knowledge as to herself and her own acts, upon due investigation of counsel and upon information and good-faith belief.

## INTRODUCTION

1. Taboola is a global ad-tech company that operates one of the largest content-recommendation and native advertising networks in the world, placing recommendation widgets and tracking code on tens of thousands of publisher and advertiser websites and providing audience-targeting, conversion-tracking, and data-collaboration tools to marketers, agencies, and media publishers.

2. As an online data collection company, Taboola uses its suite of web-embedded software to surveil unsuspecting web users and—entirely without their notice or consent—create detailed profiles of them that include demographic information, contact information, browsing data, and other sensitive facts.

3. Taboola allows this data, which frequently includes highly sensitive information, to be used for targeted advertising by third parties. Taboola thereby creates and facilitates the capture and sale of identifiable, highly personal user profiles to unknown advertisers who use this data to target individual users with specifically placed product advertisements.

4. Americans do not reasonably expect that the articles they read, the symptoms and diagnoses they research, the medications and treatments they price, the providers, clinics, and therapists they contact, the reproductive and mental-health services they seek, the debts they carry and the financial products they compare, the precise locations from which they browse, the products they add to their carts, the purchases they complete, and the many other private and sensitive aspects of their online activities will be secretly intercepted by third-party surveillance companies, matched to their identities, and used to track, profile, and target them.

5. Defendant Taboola engages in and profits from precisely such conduct.

6. Taboola's surveillance infrastructure captures far more than usage or tracking statistics and involves much more than anonymized data.

7. Through its "Taboola Pixel" JavaScript tag and the tracking requests generated by its content-recommendation widgets, Taboola records the articles users read, the topics they explore, the products they view and purchase, and even their email addresses—granular records of content consumption and behavior that can reveal users' most sensitive characteristics including, but certainly not limited to, health concerns, financial circumstances, and personal interests.

8. The information collected through Taboola's tracking technology—including page views, content metadata, click and event activity, email addresses, and behavioral signals—is fed into Taboola's proprietary user-identification infrastructure, which in turn resolves the identities of individual consumers and tracks them across the internet.

9. Taboola uses its proprietary user-identification infrastructure to resolve these intercepted communications to the identities of individuals, enabling persistent cross-site and cross-device tracking and surveillance by connecting a user's desktop, mobile, and in-app browsing activity to a single persona.

10. Taboola then monetizes this identity-resolved data throughout the advertising ecosystem—syncing its user identifiers with ad servers, demand-side platforms ("DSPs"), supply-side platforms ("SSPs"), ad networks, and ad exchanges, and selling audience segments derived from intercepted browsing and purchasing activity—enabling those parties to target advertisements to consumers.

11. Taboola allows website operators to deploy tracking code on websites that automatically captures information communicated by users, including the URLs and metadata of the pages they visit, revealing their behaviors and interests, form

inputs including email addresses, and event-level interactions, and transmits that information to Taboola's servers.

12. Taboola provides its tracking technology and content-recommendation platform to website operators so that they can collect, organize, and monetize their own audience data, and aggregates the data it intercepts across its network of websites into cross-site consumer profiles keyed to its persistent Taboola user identifier, selling and sharing the resulting identity-resolved consumer profiles with advertising platforms and data buyers for its own commercial benefit.[1]

13. Taboola's identity infrastructure then links this intercepted information across websites, devices, and sessions, creating a persistent identity profile that allows Taboola and its customers to track and target individuals based on their browsing activity, content consumption, and personal characteristics.[2]

14. Taboola markets its audience-targeting and retargeting products as capable of identifying and reaching individual users across their desktop, mobile, and in-app environments to create an individual persona.[3]

---

[1] *Taboola Privacy Policy*, https://policies.taboola.com/privacy-policy/ (last visited Aug. 17, 2026) (stating that Taboola's "Content Discovery Platform" collects a user's device and operating system information, IP address, "the web pages accessed by Users within our Customers' websites," the referring link, the dates and times of access, interaction data, general location, and hashed email addresses, and that Taboola will "identify unique Users across devices, or . . . sync cookies and identifiers with our service providers or Customers . . . to help our Customers enhance their own data and data segments"); Cal. Dep't of Justice, *Data Broker Registration – Taboola, Inc.*, https://oag.ca.gov/data-broker/registration/186589 (last visited Aug. 17, 2026) ("Taboola may disclose or make available consumers' pseudonymous data to our trusted partners.").

[2] *Taboola Privacy Policy, supra* n. 1 ("To do this, we identify unique Users across devices, or we may sync cookies and identifiers with our service providers or Customers that do this, to help our Customers enhance their own data and data segments, or to help them target the right audience.").

[3] *Overview, Taboola Realize Advertiser Help Ctr.*, https://www.taboola.com/help/en/articles/3878030-audience-targeting-overview

15. This identity-resolved data is used by third parties to target advertising to individuals based on their personal information, browsing behavior, and content consumption.[4]

16. All of this is done without consumers' consent or awareness.

17. The breadth and sophistication of Taboola's tracking technology prevents typical consumers from knowing that Taboola is intercepting and using their sensitive communications for commercial purposes.

18. Simply put, consumers do not consent to having their personal information intercepted by a third-party data-surveillance company and having that information incorporated into a behavioral dossier merely by reading an article, browsing a website, or making a purchase online.

19. Plaintiffs are individuals whose electronic communications were intercepted by Taboola's tracking code without their knowledge or consent.

20. Plaintiff Apaydin visited and used the websites Petco.com, where she shopped for and purchased pet products, and Apartments.com, where she created an account and searched for rental housing, among other websites where Taboola intercepted her information.

21. For Plaintiff—along with countless unwitting consumers across the country—the Taboola tracking code was deployed on websites where she unsuspectingly browsed and shopped.

---

(last visited Aug. 17, 2026) (offering advertisers "Taboola Pixel audiences," "Lookalikes," and an "[a]udience data marketplace – including both Taboola's 1st party data and 3rd party segments"); Taboola Privacy Policy, https://policies.taboola.com/privacy-policy/ (last visited Aug. 17, 2026) ("We may use User Information to improve a unique User's experience across multiple browsers and devices (such as smartphones, tablets, or other viewing devices) by providing better targeted ad campaigns to that User.").

[4] *Taboola Privacy Policy, supra* n. 1.

22. As a result, her personal and private information was intercepted and used to compile robust consumer profiles; the data collected includes her email address, browsing activity, content-consumption data, purchase and search activity, and interactions with the websites.

23. Taboola, through its persistent user identifiers and cross-site consumer profiles, uses this data in conjunction with other identifiable data collected from the user to create and constantly augment persistent identity profiles that map onto specific web users.

24. As more fully described below, Plaintiff was not aware of Taboola's presence on these websites, and did not consent to the interception of her communications.

25. Plaintiffs bring this class action lawsuit on behalf of themselves and the putative Classes defined below to, among other things, enforce their fundamental privacy rights, obtain corrective change to Taboola's unlawful business model, and obtain redress for the financial, dignitary, and relational harms Taboola has caused.

26. Plaintiffs assert representative claims for: (i) violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, et seq.; (ii) invasion of privacy under the California Constitution, Art. I, § 1; (iii) intrusion upon seclusion; (iv) violations of the California Invasion of Privacy Act, Cal. Penal Code § 631; (v) violations of the California Invasion of Privacy Act, Cal. Penal Code § 632; (vi) violations of the California Invasion of Privacy Act, Cal. Penal Code § 638.51; and (vii) unjust enrichment.

## PARTIES

27. Plaintiff Nicki Apaydin is, and at all relevant times has been, a resident of Marina del Rey, California.

28. Plaintiff Kristy Wilce is, and at all relevant times has been, a resident of Woodland, California.

29. Defendant Taboola, Inc. is a corporation incorporated under the laws of the State of Delaware with a principal place of business located at 16 Madison Square West, 7th Floor, New York, NY 10010.

## JURISDICTION AND VENUE

30. This Court has jurisdiction over the subject matter of this case under 28 U.S.C. § 1331 because it arises under the laws of the United States and under 28 U.S.C. § 1367 because Plaintiff's nonfederal claims share a common nucleus of operative fact with her federal claims.

31. This Court also has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (a) this is a class action lawsuit in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (b) there are more than 100 members of the proposed class; and (c) at least one member of the proposed class, including Plaintiff, is a citizen of a state different from Defendant.

32. This Court has personal jurisdiction over Taboola because Taboola purposefully directed its conduct at California, deploying its tracking technology on websites accessed by California residents, including Plaintiff, and intercepting the communications of Plaintiffs and Class members while they were located in California and in this judicial district, and because Taboola conducts substantial business in California.

33. Venue lies in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district, including Taboola's interception of Plaintiff's communications while Plaintiff was located in this District.

//

//

//

## FACTUAL BACKGROUND

### A. TABOOLA DEPLOYS TRACKING TECHNOLOGY TO INTERCEPT AND COLLECT VAST AMOUNTS OF CONSUMER DATA.

34. Taboola was founded in 2007 and has grown into one of the largest content-recommendation and open-web advertising networks in the world.[5][6]

35. Taboola's code runs on many of the world's largest publishers—including NBC News and Yahoo—and is embedded at the device level on hardware manufactured by original equipment manufacturers including Samsung and Xiaomi.[7]

36. In 2021, Taboola acquired Connexity, a commerce-media platform, adding retailer relationships and product-level purchase data to its network; Taboola touts that, following the acquisition, it powers e-commerce recommendations driving more than one million transactions each month for brands including Walmart, Macy's, Wayfair, Skechers, and eBay. [8]

37. In January 2023, Taboola closed a 30-year exclusive commercial agreement with Yahoo, making Taboola the exclusive native advertising partner for all of Yahoo's digital properties, which reach nearly 900 million people worldwide.[9]

---

[5] *Our Story*, https://www.taboola.com/about/our-story (last visited Aug. 21, 2026).

[6] *With More Than 1.5B Recommendations Daily, Taboola Raises $15M More To Fund International Expansion*, https://techcrunch.com/2013/02/19/taboola-15m-more/ (last visited Aug. 21, 2026).

[7] *Taboola Expands Beyond Native Ads with Realize* (Feb. 26, 2025), https://www.taboola.com/press-releases/taboola-realize/ (last visited Aug. 21, 2026).

[8] *Taboola Completes Acquisition of Connexity, Creating a Powerful e-Commerce Solution for Publishers, Advertisers and Merchants Outside of Walled Gardens* (Sept. 1, 2021), https://www.taboola.com/press-releases/taboola-closes-connexity-acquisition/ (last visited Aug. 21, 2026).

[9] *Yahoo and Taboola Announce Closing of Deal; 30-Year Strategic Partnership Sees Taboola Power Recommendations for Yahoo* (Jan. 17, 2023),

38. In February 2025, Taboola rebranded and expanded its advertising platform as "Realize," which Taboola describes as the only independent performance platform that goes beyond search and social media, extending Taboola's reach beyond its traditional native "bottom-of-article" recommendation widgets into display advertising across its publisher network.[10]

39. Today, Taboola states that its platform reaches approximately 600 million daily active users across a global network of publishers, and that it leverages more than 17 years of accumulated data to deliver targeted advertising.[11]

40. Using that immense scale, Taboola markets its ability to observe consumer behavior at scale, organize that data into interest and intent profiles, and monetize those profiles by targeting advertising across its network. Each tracked page view, article impression, and recommendation click generates data that flows into Taboola's user profiles, enabling persistent surveillance and cradle-to-grave interest-profiling of hundreds of millions of consumers across the open web.

41. Taboola itself touts that its "code-on-page" integrations with publishers give its AI engine "signal unlike any other open web platform."[12] Taboola's client-side data collection is performed by two related technologies: (i) a publisher-side JavaScript loader, loaded from Taboola's servers, which runs content tracking, recommendation serving, and audience profiling in the user's browser and reports

---

https://www.taboola.com/press-releases/taboola-and-yahoo-close-deal/ (last visited Aug. 21, 2026).

[10] *Taboola Expands Beyond Native Ads with Realize, supra* n. 7.

[11] *Realize: The Performance Advertising Platform by Taboola*, https://www.taboola.com/advertise/ (last visited Aug. 21, 2026).

[12] *Taboola Launches Predictive Audiences As Part of Realize Offering*, https://investors.taboola.com/news-releases/news-release-details/taboola-launches-predictive-audiences-part-realize-offering (last visited Aug. 21, 2026).

the user's activity to Taboola's collection endpoints, such as "trc.taboola.com"; and (ii) an advertiser-side tag known as the "Taboola Pixel," often loaded from "cdn.taboola.com/libtrc/unip/<account-ID>/tfa.js" and installed in the header of every page of the advertiser's website,[13] which transmits events to Taboola.[14]

42. Per Taboola's own documentation, the base pixel fires a "page_view" event on every page of the website on which it is installed, and advertisers configure additional event pixels that report user actions—purchases, sign-ups, and content views—back to Taboola.[15] Taboola's e-commerce event framework transmits product-level events, including "PRODUCT_VIEW," "ADD_TO_CART," and "PURCHASE," each of which can carry product identifiers and the user's hashed email address.[16]

43. Taboola captures the user's interactions with each website and appends the collected data to a persistent user profile which matches individuals across websites by collecting personal identifiers and specific browsing and input data including:

a. The URLs, titles, and content of pages visited—including each initial and subsequent page a user visits on a website and the referring website from

---

[13] *Add the Base Pixel to an SPA*, https://developers.taboola.com/pixel/docs/add-the-base-pixel-to-an-spa (last visited Aug. 21, 2026).

[14] *Advanced Options*, https://developers.taboola.com/web-integrations/docs/gam-advanced-options (last visited Aug. 21, 2026).

[15] *Developer Notes,* https://help.taboola.com/hc/en-us/articles/360007856794-Developer-Notes (last visited Aug. 21, 2026).

[16] *Validation and Common Issues*, https://developers.taboola.com/pixel/docs/dco-validation (last visited Aug. 21, 2026) (mandatory PRODUCT_VIEW, ADD_TO_CART, and PURCHASE events carrying product identifiers and the user's hashed email address via the "unified_id" parameter).

which the user arrived—which reveal sensitive information about the content being viewed;[17]

b. Behavioral data, including which recommendations and advertisements are displayed to the user, which the user clicks, and engagement signals such as time on site, scroll depth, and session depth;[18]

c. Email addresses associated with users, transmitted through the pixel's "unified_id" parameter in hashed form and used to link browsing activity to a known individual;[19]

d. Third-party identifiers that tie a partner platform's own user ID to the Taboola profile by collecting stable, unique identifiers and profiling users across devices;[20]

e. Persistent cookies and device identifiers, including Taboola's unique user-ID cookies,[21] and, in Taboola's device-level deployments, mobile advertising identifiers (AAID/Mobile Device ID), SIM card data, and connection type;[22] and

f. IP addresses and user-agent strings.[23]

---

[17] *Advertiser Privacy Terms*, https://policies.taboola.com/advertiser-privacy-terms/ (last visited Aug. 21, 2026) (listing collected data including the URL of the visited page, the referring website, initial and subsequent page visits on the advertiser's website, engagement signals such as time on site, scroll depth, and session depth, hashed emails, hashed Taboola User ID, Taboola click ID, conversion data, and product information tied to the specific URL).

[18] *Id.*

[19] *Validation and Common Issues, supra* n. 16.

[20] *Privacy Policy*, https://policies.taboola.com/privacy-policy/ (last visited Aug. 21, 2026) (describing identification of unique users across devices and syncing of cookies and identifiers with partners).

[21] *Cookie Policy*, https://policies.taboola.com/cookie-policy/ (last visited Aug. 21, 2026).

[22] *Privacy Policy, supra* n. 20 (Taboola News: collection of browsing activity, clicks, AAID/Mobile Device ID, IP address, SIM card data, and connection type).

[23] *Advertiser Privacy Terms, supra* n. 17.

44. Taboola also captures user interactions with the website including clicks, form inputs, and purchase data (including product information like price and availability) drawn from the specific pages the user views.[24]

45. Because Taboola's code is installed on public-facing websites, Taboola derives its profiles from the contents of the pages a user views—the articles, topics, and categories a person reads.[25]

46. Records of the articles a person reads and the products a person researches are records of that person's thoughts. When consumers read about a medical condition, a financial hardship, a pregnancy, an addiction, or a religious or political topic, they do so with a reasonable expectation that no third party is recording that activity and appending it to a persistent, identity-linked dossier.

47. Taboola's interception of this content-consumption data, and its use of identity-resolved interest profiles to target advertising and to enrich partner platforms' data, is precisely the type of unauthorized collection and disclosure that consumers expect to be prohibited.

48. Users of the many sites where Taboola is installed intend and expect that their data be transmitted only to the websites where they shop, solicit healthcare, seek legal advice, participate in civic and social causes, or otherwise use the internet. Interception of their data infringes on these users' objective expectation of privacy. Whereas these communications are expected to be private, Taboola's operation allows third parties to tie them back to the user and interferes with their ability to remain anonymous.[26]

---

[24] *Id.*

[25] *Taboola Launches Predictive Audiences, supra* n. 12.

[26] *Tracking Overview*, https://developers.taboola.com/pixel/docs/conversion-tracking-overview (last visited Aug. 21, 2026).

49. Because in each case the transmission of the contents of Plaintiffs' and Class members' electronic communications occurred simultaneously with the user's interaction with these websites, these communications are in transit when they are intercepted.

## B. Taboola Engages in Cross-Device Identity Resolution.

### i. Taboola Identifies and Surveils Web Users Through a Multifaceted Tracking Scheme that Operates Across Many Websites.

50. At the core of Taboola's surveillance capabilities is its proprietary user-identification infrastructure and the persistent Taboola user ID (the "Taboola ID")—a unique identifier Taboola assigns to each browser and then links to other devices and identifiers to create a unified profile of individual consumers.[27]

51. The Taboola ID draws on signals such as device type, IP address, user-agent string, and behavioral patterns to resolve fragmented identity data into a single consumer profile.[28]

52. When Taboola's code runs on a page, it assigns the visitor a unique identification number and files the data it collects under that number. Taboola's own documentation and third-party cookie disclosures identify what that file contains. An identifying marker derived from that file, the Taboola ID, is stored in the "t_gid" cookie and is thereafter duplicated in the "trc_cookie_storage" cookie and in the "taboola global:user-id" storage area of the browser. [29]

---

[27] *Taboola ID*, https://docs.prebid.org/dev-docs/modules/userid-submodules/taboola.html (last visited Aug. 21, 2026).

[28] *User ID Object*, https://developers.taboola.com/backstage-api/reference/user-id-object (last visited Aug. 21, 2026).

[29] *Tracking Overview*, *supra* n. 26. *Taboola, Submitting First Party Data*, https://developers.taboola.com/pixel/docs/submitting-first-party-data (last visited Aug. 21, 2026) (documenting the "unified_id" parameter, through which a lowercased, SHA-256 hashed email address is passed to Taboola with the

53. This file also includes the "taboola_session_id" value, a short-term identifier that Taboola often sets directly from its own servers and that marks a single browsing session so Taboola can group together everything the person did during that visit. The file also includes the "unified_id" parameter, through which the website operator hands Taboola its own identifier for the user—typically the user's encoded email address—which Taboola then ties to the Taboola ID, connecting the browsing file to a real, identifiable person. It also includes the ID numbers that other advertising platforms use for the same person, which Taboola links to its own Taboola ID, along with the audience categories into which Taboola has sorted the person for ad targeting across its network.[30]

54. Taboola does not require a consumer to provide their name or email address to track them, but if a consumer provides that information on a webpage where Taboola's trackers are running, it is captured and attached to the "unified_id" associated with that individual.

55. Where a hashed email address or other unique, unchangeable identifier is unavailable, Taboola's probabilistic matching silently analyzes device characteristics, network attributes such as IP address, and behavioral signals to uniquely identify site users and infer that distinct interactions across devices originate from the same person.[31]

56. The Taboola Pixel identifies users by capturing their email address, encoding it, and storing this under the "unified_id" parameter which Taboola can

---

"page_view" event); *t_gid Cookie*, https://cooki.fi/cookies/t-gid/ (last visited Aug. 21, 2026).

[30] *Submitting First Party Data*, *supra* n. 29.

[31] *Adjust Direct to App*, https://developers.taboola.com/pixel/docs/adjust-direct-to-app (last visited Aug. 21, 2026) (documenting the probabilistic modeling feature).

deterministically link to any other session across its network where the same email address was provided, creating a unified view of that consumer's browsing activity across the internet.[32]

57. Taboola links that unified_id—and with it the consumer's hashed email address—to the persistent Taboola ID, so the browsing history filed under the otherwise-pseudonymous Taboola ID is permanently tied to a real, identifiable person. This allows Taboola to follow a consumer across their devices and platforms without their awareness. Mobile browsing, desktop activity, and in-app viewing are linked through IP addresses, identifiers, and behavioral patterns, assembling a cross-device profile that persists and expands over time—even for consumers who have never volunteered a single piece of identifying information.

58. Taboola also identifies users by setting persistent cookies on visitors' browsers via its own domains, such as "taboola.com" and "trc.taboola.com".

59. Third-party cookie documentation confirms what each of these identifiers does and how long it lasts. The "t_gid" cookie is categorized as a marketing cookie, meaning its purpose is to track a user's behavior across websites and to serve that user targeted advertising afterward. The "trc_cookie_storage" cookie likewise stores a unique user ID, and it remains on the user's device for a full year. Taboola stores that same identifier a second time in a location called "taboola global:user-id," which is not a cookie but a separate storage area inside the user's

---

[32] *Submitting First Party Data*, Taboola Developers, https://developers.taboola.com/pixel/docs/submitting-first-party-data (last visited Aug. 27, 2026); *Google Tag Manager*, Taboola Developers, https://developers.taboola.com/pixel/docs/dco-gtm-setup (last visited Aug. 27, 2026).

browser. Taboola also sets a short-term identifier, "taboola_session_id," that lasts only for as long as the user's browsing session.[33]

60. Taboola continuously adds to these profiles on its own servers by exchanging identifiers with other advertising companies. Through a process called "cookie matching," Taboola notifies partner companies of the "taboola_id" parameter assigned to the person currently visiting a webpage. The partner records that its own ID and Taboola's ID belong to the same person, so that everything Taboola knows about that person and everything the partner knows about that person can be combined into a single file. What began as an anonymous marker in one web browser becomes, through this process, a lasting profile of one individual that follows them from website to website and from device to device.[34]

61. In sum, Taboola's tracking code records what a person does online—the pages they read, the subjects and products they look at, the actions they take on a page, and their email address wherever a website makes it available—and files all of it under the single ID number Taboola has assigned to that person.

62. Because that ID number is matched to the person's other devices and to the ID numbers other companies use for them, the file grows into a single record of one person's activity across everywhere Taboola operates. Taboola then measures that record against its own criteria for categories of consumers—for example, people

---

[33] *Cookie Policy, supra* n. 21*; t_gid Cookie, supra* n. 29 (Taboola marketing cookie used to track usage behavior and enable retargeting); trc_cookie_storage, Cookiedatabase.org, https://cookiedatabase.org/cookie/taboola/trc_cookie_storage/ (last visited Aug. 21, 2026) (Taboola cookie storing a unique user ID, one-year expiration); *taboola global:user-id,* https://cookiedatabase.org/cookie/taboola/taboola-globaluser-id/ (last visited Aug. 21, 2026) (browser-storage key storing a unique Taboola user ID).

[34] *Taboola Cookie Matching Service Tag Setup Guide,* https://docs.tealium.com/client-side-tags/taboola-cookie-matching-service-tag/ (last visited Aug. 21, 2026) (tag returns "the Taboola ID in the server-side attribute taboola_id").

whose behavior suggests they are in the market for a new car, or are shopping for a particular financial or health product—and places the person into every category whose criteria their behavior meets. Taboola makes those categories available to advertisers, who pay to direct advertising at the people in them, both on Taboola's own network and, through the identifier matching described above, on other advertising platforms.

ii. Taboola's Tracking Defaults to Collection and Renders Consumers' Privacy Controls Ineffective.

63. The Taboola Pixel is a small piece of code that a website operator copies into the pages of its own website. The code is loaded from Taboola's own servers, and each operator that installs it is assigned its own account number, which the code reports back to Taboola. The code begins running the instant the visitor's browser starts reading the page. It immediately creates a record of the visit and places that record in line to be sent to Taboola—all before Taboola's larger tracking program has finished loading, and before any of the page's content has appeared on the visitor's screen.[35]

64. It then injects a script element into the page that retrieves that library from Taboola's servers and executes invisibly in the visitor's browser, and transmits detailed tracking data directly to Taboola's collection endpoints before they are stored in any other server or endpoint.[36]

65. By default, the Taboola Pixel begins collecting data as soon as it loads: the snippet Taboola supplies fires a "page_view" event on every page into which it

[35] *Add the Base Pixel Manually*, https://developers.taboola.com/pixel/docs/add-the-base-pixel-manually (last visited Aug. 21, 2026).

[36] *Id.* (base code creates a script element, sets "t.async = 1," sources it from "//cdn.taboola.com/libtrc/unip/<account_id>/tfa.js," and inserts it into the page ahead of the first existing script element).

is inserted, before the visitor clicks anything. Taboola's automatic event tracking then "automatically tracks clicks on your landing page and reports them as events," and Taboola's documentation states that "[n]o additional code or configuration is required on your site"—confirming that collection is the default state of the pixel rather than something a website operator must affirmatively switch on, and that the pixel collects data without waiting for anyone's consent.[37]

66. Taboola will only limit its tracking and interception technology on a given webpage if the website operator has deployed a consent mechanism and configured it to not allow Taboola to begin running until a consumer has provided consent.

67. Because collection is the Taboola Pixel's default state, Taboola never seeks consumer consent; it instead defers that obligation to the website operator, even though it is Taboola collecting a host of sensitive data from the consumer.[38]

68. The privacy controls Taboola relies on are thus illusory from the consumer's perspective: the consumer has no relationship with Taboola, no notice that the Taboola Pixel is running, and no mechanism to communicate a refusal directly to Taboola.

69. A consumer's browser-level privacy preferences are honored only if each of the many website operators deploying Taboola's code has separately and

---

[37] *Automatic Event Tracking*, https://developers.taboola.com/pixel/docs/automatic-event-tracking (last visited Aug. 21, 2026) ("Once the base pixel is installed, it automatically tracks clicks on your landing page and reports them as events"; "No additional code or configuration is required on your site."); *Add the Base Pixel Manually, supra* n. 35 (base snippet fires a "page_view" event on each page).

[38] *Taboola, Advertiser Privacy Terms, supra* n. 17 (placing responsibility for obtaining end-user consent on the advertiser deploying the pixel); *Cookie Banner Settings*, https://developers.taboola.com/pixel/docs/shopify-cookie-banner-settings (last visited Aug. 21, 2026) (consent-banner configuration left to the website operator).

correctly configured it to pass those preferences through, and even more fundamentally if the website operators themselves seek user consent for the type of information Taboola tracks and collects.

70. On information and belief, most or all of the websites deploying Taboola's code do not configure these optional consent controls, with the result that Taboola collects data from consumers, including consumers who have activated browser privacy signals, by default.

71. Even a consumer who inspected their browser's network activity would have no practical way of understanding that requests to Taboola's servers represent a third-party advertising network intercepting their communications, resolving their identity, and packaging them into audience segments for sale.

72. Taboola uses its tracking code as a window into unsuspecting website visitors' activity, operating as a means of continuous surveillance to create a record that Taboola ultimately monetizes through its advertising network and audience-targeting products.

iii. Taboola's Tracking Technology Intercepts and Records Data From Users Across the Web.

73. Taboola offers two types of tracking technologies to websites. The first retrieves Taboola's tracking code and loads it into every page of the website,[39] and the second delivers the collected data to an address on Taboola's "trc.taboola.com" server dedicated to receiving tracking logs, labeled with the type of activity being reported—for example, that the visitor viewed a page.[40]

---

[39] *Developer Notes*, *supra* n. 15.

[40] *Taboola, Using DoubleClick Campaign Manager (DCM) – Floodlight Tags,* https://help.taboola.com/hc/en-us/articles/360012186374-Using-Doubleclick-Campaign-Manager-DCM-Floodlight-Tags (last visited Aug. 9, 2026).

74. Taboola's own developer materials list what these messages contain. They carry the type of activity being reported and the website's Taboola account number; details of any purchase, including the products bought, the order number, and the amount paid; the user's encoded email address, where captured; and the user's IP address, technical details identifying their browser and device, the page they came from, and the time of the visit.[41]

75. Taboola also offers a second tracking method—an "image pixel"—for website operators that cannot or choose not to install Taboola's JavaScript code. An image pixel is a tiny, invisible image hosted on Taboola's servers. Taboola instructs operators to generate this pixel in Taboola's platform and place it on their websites, and whenever a visitor's browser displays a page containing the pixel, the browser automatically requests the invisible image from Taboola's servers—and that request itself reports the visitor's activity to Taboola. The two methods differ only in how the report is triggered; the information Taboola receives is the same.[42]

76. Taboola also tracks clicks on the advertisements it serves. When a person clicks a Taboola advertisement, Taboola automatically adds a unique tracking code—"tblci"—to the web address of the page the click takes them to, so the person arrives at the advertiser's website already tagged with a Taboola identifier.[43]

---

[41] *Validation and Common Issues, supra n. 16* (event names, product identifiers, unified_id hashed email).

[42] *Taboola Image Pixel*, https://developers.taboola.com/pixel/docs/taboola-image-pixel (last visited Aug. 21, 2026).

[43] *Manual S2S Integration*, https://developers.taboola.com/pixel/docs/s2s-manual-integration (last visited Aug. 21, 2026); Taboola by default automatically appends tblci={click_id} to all ad URLs, with the actual value appended to the target URL when the ad displays; Taboola, *Track CRM-based conversions using S2S*, https://developers.taboola.com/pixel/docs/s2s-track-crm-conversions (last visited Aug. 21, 2026).

77. Taboola instructs operators to capture that "tblci" code when the visitor arrives—typically from the web address of the page the visitor lands on—store it, and send it back to Taboola with reports of the visitor's later actions, including reports sent from the operator's own computer systems about activity long after the visit—such as a completed purchase, or a sales lead advancing through the operator's customer files—all tied by the same click code to the same person.[44]

78. Taboola's documentation confirms that the "tblci" click code is used to recognize users "especially in cookieless environments"—for example, Apple's Safari browser and iPhones, which often block tracking cookies like Taboola's in order to protect their users—in other words, even when a person uses a browser designed to prevent tracking, or takes steps to block tracking cookies and tracking technologies, Taboola continues to follow them through the click code.[45]

79. The purpose of this mechanism, as described in Taboola's own cookie policy, is to track visitors across websites in order to measure their actions and "create a custom audience for our advertiser Customers to target on our network (i.e. retargeting)."[46]

80. The data captured through Taboola's code will often include highly sensitive personally identifiable information.

81. Taboola's documentation confirms that the pixel transmits user-identifying information (i.e., hashed email addresses) provided to Taboola in the "unified_id" parameter, and that Taboola keeps that encoded identifier in the user's

---

[44] *Track CRM-based conversions using S2S, supra* n. 43.

[45] *Testing Tool*, https://developers.taboola.com/pixel/docs/testing-tool (last visited Aug. 21, 2026).

[46] *Taboola Image Pixel, supra* n. 42; *Cookie Policy, supra* n. 21 ("[W]e may use pixel tags to track conversions or to create a custom audience for our advertiser Customers to target on our network (i.e. retargeting).").

profile and uses it to recognize the same person wherever else that person appears across Taboola's network.[47]

82. An email address is a durable identifier that rarely changes: unlike a cookie, it cannot be deleted or reset by the user. Once captured and incorporated into Taboola's database as a Taboola ID number, it permanently links the user's otherwise-anonymous browsing profile to their real-world identity. California law accordingly treats email addresses and other "unique personal identifiers" as personal information. *See* Cal. Civ. Code § 1798.140(v)(1)(A) ("personal information" includes "email address" and any "unique personal identifier"); *id.* § 1798.140(aj) (defining "unique identifier" as "a persistent identifier that can be used to recognize a consumer . . . over time and across different services," including "cookies, beacons, pixel tags, mobile ad identifiers, or similar technology" and other "probabilistic identifiers").

83. Taboola's Pixel is designed to individually identify consumers and classify them by their interests and behaviors. It captures the URL of the page visited, the referring website, and product- and content-level parameters, and add-to-cart and purchase events, among other sensitive data. Taboola's advertiser terms confirm that it collects each initial and subsequent page a user visits together with engagement signals such as time on site, scroll depth, and session depth—signals that, depending on the content a user consumes, can reveal the user's health concerns, financial circumstances, political and religious views, and other sensitive characteristics.[48]

---

[47] *Submitting First Party Data, supra n. 29* ("all Email IDs must be converted to lowercase and hashed via SHA256" and passed to Taboola in the "unified_id" parameter with the "page_view" event).

[48] *Advertiser Privacy* Terms, https://policies.taboola.com/advertiser-privacy-terms/ (last visited Aug. 28, 2026).

84. In addition to capturing page views and identity data, Taboola's code is designed to capture and record user interactions over time.

85. Taboola's code also lets website operators send Taboola reports about specific actions a visitor takes on a page. Even where an operator sets up no such reports, Taboola's automatic event tracking captures the visitor's on-page clicks by default.[49]

86. Taboola deploys this collection method in both standardized and customizable form across its network of customer websites.[50]

87. Through the use of these methods, Taboola captures sensitive data directly in web users' browsers and transmits their communications to Taboola contemporaneously with the user's intended communication with the website.[51]

88. What the user browses, reads, clicks, or submits to the website is simultaneously captured and redirected to Taboola's servers in real time.

89. Each deployment of Taboola's tracking technologies, as detailed above, transmits data to Taboola's servers through the same basic methods, even though the precise data collected may vary from website to website.[52]

90. Like other websites across Taboola's network, StartWillow.com, Petco.com and Apartments.com—the websites Plaintiffs Apaydin and Wilce used, discussed in Section F below—do not adequately disclose to users Taboola's cross-device identity resolution, data aggregation, audience classification, or distribution of user data to advertising platforms and data buyers.

---

[49] *Automatic Event Tracking*, *supra* n. 37.

[50] *Add the Base Pixel Manually, supra* n. 35 (single snippet differentiated only by the numeric Taboola Account ID); *Automatic Event Tracking*, *supra* n. 37.

[51] *Add the Base Pixel Manually, supra* n. 35

[52] *Id.*

91. Users who visited these websites, or any website where Taboola was active, and read content or entered their personal information were therefore unaware that their communications were being simultaneously intercepted and transmitted to Taboola's servers.

### C. TABOOLA SHARES CONSUMER DATA WITH ADVERTISING PLATFORMS AND DATA BUYERS.

92. Taboola is a data broker. California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [i.e., consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c). Any entity that qualifies as a "data broker" under California law must specifically register as such. Cal. Civ. Code § 1798.99.82(a).

93. Taboola, Inc. is a registered data broker in California—a public acknowledgment that it knowingly collects and sells to third parties the personal information of consumers with whom it has no direct relationship.

94. Taboola's documentation and integration documentation published by its partners describe three distinct mechanisms by which Taboola monetizes the consumer profiles it builds and makes them available to third parties.

95. First, Taboola uses the profiles it assembles to target advertising on its own network: the audience segments derived from a consumer's browsing are made available to Taboola's advertiser customers, who select them to reach that consumer across the publisher properties on which Taboola serves content and advertisements. Taboola's cookie policy confirms that it uses its pixel tags to "create a custom audience for our advertiser Customers to target on our network (i.e. retargeting),"

and its Predictive Audiences product extends those segments to additional users Taboola predicts share the same characteristics.[53]

96. Second, Taboola's code participates in synchronization requests exchanged with third-party platforms from the user's browser as the page loads, through the cookie-matching service Taboola makes available to its partners.[54]

97. As described above, Taboola's customer websites initiate the match by calling Taboola's servers as the page loads, and Taboola returns the identifier it has assigned to that user. These exchanges supply third-party advertising companies the key required to join Taboola's record of a consumer's browsing to their own records of the same consumer, in real time as the consumer browses.[55]

98. Third, Taboola exchanges consumer data server-to-server, outside the browser entirely. Taboola's server-to-server integrations transmit user, event, and conversion data directly between Taboola and its customers' and partners' systems, and Taboola publishes a list of the third-party partners, ad networks, data providers, and service providers with which it exchanges data as part of its services.

99. Taboola's own disclosures confirm the character of this activity. Taboola's privacy policy states, in capital letters, that "the entity maintaining this website is a data broker under Texas law," and that a data broker must register with the Texas Secretary of State in order to conduct business in Texas. Taboola, Inc. is

---

[53] *Cookie Policy, supra* n. 21 ("[W]e may use pixel tags to track conversions or to create a custom audience for our advertiser Customers to target on our network (i.e. retargeting)."); *Taboola Launches Predictive Audiences As Part of Realize* Offering, *supra* n. 12.

[54] *Taboola Cookie Matching Service Tag Setup Guide, supra* n. 34.

[55] *Id.* (the tag "sends the Taboola ID in the server-side attribute taboola_id"); *Taboola*, https://docs.lytics.com/docs/taboola (last visited Aug. 21, 2026) (cookie-sync requests to Taboola endpoints to match Lytics identifiers with Taboola IDs and populate user profiles with the user's Taboola ID).

likewise a registered data broker with the California Attorney General, as alleged above. Taboola further identifies itself as a member of the Network Advertising Initiative and as a registered vendor in the IAB Europe Transparency & Consent Framework, bearing vendor number 42.[56]

100. Critically, the identifiers involved are not limited to cookies: Taboola's own disclosures describe hashed email addresses, the hashed Taboola ID, Taboola click identifiers, mobile advertising and device identifiers, IP addresses, and connection data—any of which can be used to recognize the same person across browsers, devices, and mobile applications.[57]

101. User activities like page views, clicks, and purchase or conversion events are reported to Taboola as they occur and appended to a user profile, updating each user's profile and making it available for targeting on an ongoing basis. These constantly updated consumer profiles are made available to participants in the broader advertising ecosystem.[58]

102. Taboola's relationships with advertising platforms confirm that those platforms are active collaborators in Taboola's surveillance infrastructure.

---

[56] *Privacy Policy, supra* n. 20 ("THE ENTITY MAINTAINING THIS WEBSITE IS A DATA BROKER UNDER TEXAS LAW. TO CONDUCT BUSINESS IN TEXAS, A DATA BROKER MUST REGISTER WITH THE TEXAS SECRETARY OF STATE."); id. (Privacy Self-Regulation) (Taboola "participates in the IAB Europe Transparency & Consent Framework and complies with its Specifications and Policies as vendor number 42," and is "a proud member of the NAI"); Cal. Dep't of Justice, Data Broker Registry, Data Broker Registration for Taboola, Inc., https://oag.ca.gov/data-broker/registration/186589 (last visited Aug. 21, 2026).

[57] *Advertiser Privacy Terms*, *supra* n. 17 (hashed emails, hashed Taboola User ID, Taboola click ID, and conversion and product data); Taboola, Privacy Policy, *supra* n. 20 (AAID/Mobile Device ID, IP address, SIM card data, and connection type).

[58] *Third Party Cookies and Technologies Used in Taboola's Services,* https://policies.taboola.com/third-party-cookies-and-technologies-used-in-taboolas-services/; *Taboola, Tracking Overview, supra* n. 29 (server-to-server transmission of conversion data).

103. On information and belief, the platforms provide Taboola with technical specifications for data formatting, delivery, and ID syncing; Taboola provides the platforms with identity-resolved consumer profiles enriched with browsing and content-consumption behavior from across its network.

104. This collaboration amplifies the privacy harm to consumers, whose personal information becomes embedded in advertising systems designed to exploit that information for commercial purposes.

## D. TABOOLA IS A THIRD-PARTY EAVESDROPPER, NOT AN EXTENSION OF WEBSITE OPERATORS.

105. Taboola is not a mere extension or agent of the website operators who deploy its tracking code, but an independent third-party eavesdropper with its own commercial interests in the data it intercepts.

### i. Website Operators Deploy Taboola to Collect, Enrich, and Monetize Their Own Data.

106. Website operators embed Taboola's recommendation code and base pixel into their websites to collect and consolidate their own first-party data about site visitors into a single, unified customer profile, which Taboola's platform then enriches with additional demographic, behavioral, and interest attributes drawn from the activity Taboola observes across the rest of its network.[59]

107. Using Taboola's platform, website operators build custom audience segments, obtain insights about the people who visit their properties, and improve

---

[59] *Taboola Pixel*, https://developers.taboola.com/pixel/docs/pixel-overview (last visited Aug. 21, 2026) (pixel "gathers data about user actions on your site" and "allows you to track conversions, and target custom audiences"); *Realize: The Performance Advertising Platform by Taboola, supra* n. 11.

the targeting and measured performance of the advertising they sell against their own inventory.[60]

108. Website operators also use Taboola to monetize visitor data directly: by placing Taboola's recommendation feed on their pages, a publisher converts data about its own visitors into targeted sponsored placements sold through Taboola's network, and shares in the resulting advertising revenue.[61]

ii. Taboola Independently Exploits the Intercepted Data for Its Own Commercial Benefit.

109. Unlike a simple analytics tool that processes data solely for the benefit of a single website operator, Taboola aggregates and links user data across its entire network of client websites through its identity graph and ID.

110. When a consumer visits Petco.com, for example, Taboola does not merely analyze that interaction for Petco.com's benefit but links that interaction to the consumer's browsing history on every other Taboola-tracked website, creating a unified identity profile that no individual website operator could construct and that serves Taboola's independent commercial interest in building a comprehensive surveillance infrastructure.

111. Taboola integrates with ad servers, among other data sources, for inbound and outbound data transfer including the transfer of data to ad exchanges to

---

[60] *Realize Tracking Set Up Overview*, https://realize.com/help/en/articles/6248618-realize-tracking-set-up-overview (last visited Aug. 21, 2026) (pixel "gathers data about users behavior and actions on your website, like page visits, account creation, purchases, time per session," used to "make more data-driven decisions" and "attribute conversions and analyze campaign's efficiency"); *Taboola Pixel*, *supra* n. 59.

[61] *Cookie Policy, supra* n. 21*; Yahoo and Taboola Announce Closing of Deal; 30-Year Strategic Partnership Sees Taboola Power Recommendations for Yahoo, supra* n. 9 (Taboola powering and monetizing recommendations across a publisher's properties).

match third-party data to audience segments and the transfer of data to ad networks and exchanges for media buys.

112. Taboola transmits identity-resolved consumer data to these third parties pursuant to commercial arrangements Taboola has established with them.[62]

113. These arrangements serve Taboola's independent business interests—enhancing its product offering, strengthening its market position, and generating value through data-sharing arrangements—not merely the interests of the website operators whose users' data is transmitted.

114. A website operator deploying Taboola's tag does not control, and may not even be aware of, the data flows from Taboola to advertising platforms and data brokers through Taboola's sync pixels, export beacons, and outbound batch transfers.

115. Website operators deploying Taboola's tracking code do not exercise meaningful control over Taboola's collection, retention, and use of the data Taboola intercepts.

116. Taboola independently determines: (a) the technical specifications of its tracking code and what data it captures; (b) how long intercepted data is retained in Taboola's systems; (c) how Taboola links users across its client network; (d) which third parties receive data through sync pixels, export beacons, and outbound transfers; and (e) what security measures protect intercepted data.

117. Taboola also derives independent commercial benefit from the data it intercepts beyond providing services to individual website operators. Taboola's

---

[62] *Third Party Cookies and Technologies Used in Taboola's Services, supra* n. 58 (identifying the third-party partners, ad networks, and data providers with which Taboola exchanges data as part of its services); *Taboola Cookie Matching Service Tag Setup Guide*, supra n. 34.

identity graph and tracking technologies are built from aggregated consumer data collected across all of Taboola's client websites.

118. Each consumer interaction Taboola intercepts enhances the accuracy and comprehensiveness of the identity graph, increasing Taboola's ability to resolve identities, improving its audience segments, and enabling Taboola to charge premium prices for its data products.

119. This accumulation of data assets for Taboola's independent commercial benefit distinguishes Taboola from a mere analytics tool operating solely for the benefit of website operators.

120. Taboola's own documentation confirms that the data it collects becomes an asset of Taboola's platform. Data collected through the Taboola Pixel is passed to Taboola's servers, resolved into Taboola-owned identifiers, and stored in Taboola's systems.[63] And, Taboola uses the Taboola Pixel to "integrate and link data" and to "optimize the manner in which it collects, segments, or targets" content, and —"[f]or avoidance of doubt"—"may create derivative data products and data models (e.g., segmentation and optimization models) from these Taboola Pixels, which it shall own."[64]

121. Taboola's commercial offering further demonstrates the independent benefit it derives from interception. Taboola packages the audience data it collects across its network into audience segments and identity-resolved profiles that it makes available to advertisers and platforms for targeting, conduct that has required Taboola to register as a data broker under Texas and California law.

---

[63] *Taboola Pixel, supra n. 59* (pixel "gathers data about user actions on your site, so that Taboola can optimize your campaigns" and "allows you to track conversions, and target custom audiences"); *Submitting First Party Data, supra n. 29* (hashed email addresses passed via the "unified_id" parameter).

[64] *Taboola Terms and Conditions for United States* § 6.4, Taboola Policies (Sept. 26, 2025), https://policies.taboola.com/terms-and-conditions/.

122. These offerings confirm that Taboola's identity graph—built from data intercepted through its tracking technology deployed across thousands of websites—is the core commercial asset of the company, not a byproduct of an analytics service.

### E. Taboola Never Obtained Effective Consent to Its Data Gathering Practices.

123. Taboola conducts its surveillance in a manner that neither obtains consent from the persons whose data it intercepts nor could support a defense of consent as a matter of law, given the lack of adequate disclosure and the extent of the privacy rights that are violated.

124. Plaintiffs and Class members have no direct relationship with Taboola.

125. They do not knowingly interact with Taboola's services or visit Taboola's website. Taboola's tracking code operates invisibly in the background, intercepting communications.

126. Taboola never directly obtains consent from the persons whose data it intercepts.

127. Consumers using telehealth services, reading the news, researching products, or browsing the web reasonably expect their interactions to remain between themselves and the website they are visiting; they do not expect that a third-party data management platform is intercepting their activity and appending it to a persistent, identity-resolved profile.

128. Furthermore, most websites deploying Taboola's tracking code do not adequately inform users that Taboola is independently collecting their data and constructing persistent personal profiles.

129. Taboola provides no notice to consumers that it is collecting their communications, browsing behavior, form inputs, and other sensitive information.

//

//

130. Taboola does not present consumers with an opportunity to opt out of its identity graph or to prevent their data from being shared with advertising platforms and data buyers on the websites it operates on.

131. Taboola operates entirely in the shadows, intercepting consumer data without the knowledge or authorization of the individuals whose privacy it invades.

132. The information asymmetry between Taboola and the consumers whose data it intercepts makes genuine consent practically unattainable.

133. Taboola's tracking operates invisibly, and no normal, reasonable consumer in the course of commercial internet use would suspect the presence of a comprehensive data management platform on sites where Taboola is present. Likewise, website operators have every incentive not to highlight a third party's surveillance of their users.

134. Taboola encourages and facilitates this non-disclosure by designing its tracking infrastructure to be invisible to consumers.

135. Taboola possesses complete knowledge of its tracking code's capabilities, the data it collects, how its identity graph resolves identities, and which third parties receive consumer data through its distribution channels.

136. Consumers, by contrast, cannot reasonably observe Taboola's tag executing in their browsers, inspect the data payloads transmitted to Taboola's servers, or discover that their personal information has been linked to a persistent identity profile and distributed to advertising platforms and data buyers.

137. This asymmetry is fundamental to Taboola's business model. Most consumers object to being tracked across the web and, when aware of such tracking,

take affirmative steps—disabling cookies, installing ad blockers, and disengaging from brands that track them—to avoid the very surveillance Taboola conducts.[65]

138. Taboola's tracking is nonetheless designed to operate without consumers' knowledge or meaningful consent.

139. The complexity of Taboola's technical infrastructure, which involves persistent cookies, deterministic and probabilistic identity matching, server-side graph enrichment, automatic page scraping, and real-time and batch data sharing with multiple advertising platforms, demonstrates that Taboola's tracking is engineered to operate beyond the visibility of reasonable consumers, rather than through any transparent, consent-based framework.

140. Moreover, Taboola defaults to automatic collection and any privacy controls depend entirely on website operators. Data collection begins as soon as the tag loads unless the operator has affirmatively configured it otherwise; the consent signal by which consumers communicate a refusal to be tracked is honored only if the operator has deployed a consent management platform and has programmed it to transmit that signal to Taboola; and consumers who have taken affirmative steps to limit tracking have no way to verify—and no reason to believe—that each website they visit has correctly configured Taboola's optional consent controls.[66]

---

[65] *See, e.g.*, *GumGum, Consumers Say No to Data Tracking*, https://gumgum.com/blog/consumers-say-no-to-data-tracking (last visited July 24, 2026) (62% of consumers uncomfortable with online tracking; 38% have installed ad blockers); Pew Research Center (May 2023) (67% of U.S. adults turn off cookies or website tracking to protect their privacy), as reported in ANA, Privacy, Data, and Consent: Consumer Attitudes (Dec. 2023), https://www.ana.net/miccontent/show/id/aa-2023-12-consumer-privacy (last visited July 24, 2026); Joseph Turow et al., Univ. of Pa. Annenberg Sch. for Commc'n, Americans Don't Understand What Companies Can Do With Their Personal Data (2023), https://www.asc.upenn.edu/news-events/news/americans-dont-understand-what-companies-can-do-their-personal-data-and-thats-problem (last visited July 24, 2026).

[66] *GDPR and US State Privacy Laws*, https://developers.taboola.com/web-integrations/docs/gdpr-and-ccpa (last visited Aug. 9, 2026) ("If your web page

141. Because Taboola's tracking infrastructure begins immediately collecting data on page load by default and provides consumers neither notice of its practices nor a direct means of refusal on the websites, Taboola cannot credibly claim that consumers have consented to its tracking.

142. Consumers who have activated browser privacy signals have communicated a clear preference not to be tracked, yet whether that preference has any effect depends entirely on configuration choices those consumers cannot see and have no control over.

## F. REPRESENTATIVE PLAINTIFFS' EXPERIENCE.

### *i. Plaintiff Apaydin's Experience.*

143. In or around 2026, Plaintiff Nicki Apaydin visited and used the websites Petco.com and Apartments.com, each of which deploys Taboola's tracking technology. Petco.com is an online retailer through which consumers browse and purchase pet food, supplies, and related products. Apartments.com is an online rental-listing platform through which consumers create accounts and search for housing.

144. Plaintiff Apaydin used Petco.com in or around 2026 to browse pet products and to complete a purchase through the website. Plaintiff Apaydin used Apartments.com in or around 2026 to search for rental housing, including by creating an account and browsing rental listings through the website.

---

integrates with a GPP-compliant CMP (Consent Management Platform), Taboola will collect the consent automatically"; "[b]y default, the value of the cex flag is 'true', allowing Taboola to make use of the user's data"; directing operators to pass a "cdns" flag communicating "Do Not Sell" status, with "a new value for each new user session," and to "[l]oad your CMP script as early as possible (before Taboola content is fetched)"); *Consent Management Technical Integration Guidelines for Publishers,* https://www.taboola.com/documents/consent-management-technical-integration-guidelines-publishers.pdf (last visited Aug. 9, 2026) (placing on the publisher the obligation to pass the consent signal to Taboola).

145. During these visits, the websites invited Plaintiff Apaydin to communicate personal information to them, and Plaintiff Apaydin did so, including:

a. Plaintiff's name, address, and other personal information, entered to create her account and to place orders;

b. The articles, products, and other content Plaintiff viewed, including page titles, tags, and categories;

c. Plaintiff's payment information and order history, communicated in connection with her orders on the websites;

d. Click activity and other interactions with the websites' pages; and

e. Plaintiff's consumer interests and search activity, including the pet products she viewed and purchased on Petco.com and the rental listings, locations, and price ranges she viewed and searched on Apartments.com.

146. When Plaintiff Apaydin visited Petco.com and Apartments.com and communicated this personal information, Taboola's tracking tools were present on both websites and intercepted the contents of Plaintiff's communications with them.

147. Taboola's identity graph then used the intercepted information, along with other tracking data, to identify Plaintiff and associate this information with Plaintiff's persistent identity profile.

148. As deployed on Petco.com and Apartments.com, the Taboola tracking code captured page views, clicks, and form inputs as Plaintiff submitted them.

149. The tag captured page URLs and content metadata that corresponded to the substance of what Plaintiff was reading and doing on the websites, along with behavioral and event-level data transmitted to Taboola's servers in real time.

150. At no time did Plaintiff Apaydin consent to Taboola intercepting Plaintiff's communications with Petco.com or Apartments.com.

151. Plaintiff did not have a direct relationship with Taboola and was unaware of Taboola's presence on the websites.

//

152. The Petco.com and Apartments.com privacy policies did not identify Taboola as a recipient of user data.

153. Taboola's data collection runs by default upon page load unless the website operator affirmatively configures otherwise, and on information and belief, neither Petco.com nor Apartments.com configured Taboola's optional consent controls or passed Plaintiff's browser privacy signals through to Taboola.

154. Plaintiff therefore had no means of discovering or preventing Taboola's interception, and at no time did Plaintiff consent to Taboola using Plaintiff's personal information for identity resolution, audience classification, or distribution to advertising platforms and data buyers.

155. Taboola subsequently distributed data derived from Plaintiff's intercepted communications to third-party advertising platforms and data buyers through its sync pixels, export beacons, and outbound batch transfers, enabling those parties to target advertisements to Plaintiff based on Plaintiff's browsing activity.

156. Analysis of websites deploying Taboola's tag confirms the operation of its tracking infrastructure.

157. The Taboola tracking code deployed on these websites is loaded using the website operator's unique Taboola account identifier and transmits collected data to Taboola's collection endpoints.

158. Each collection request transmitted to Taboola's servers carries the contents of the data object documented in Taboola's reference guides—including behaviors, page-level content metadata such as article titles and tags, any captured identity data, and third-party identifiers—together with Plaintiff's IP address, user-agent, and the URL of the page being visited.

159. The Taboola tracking code also sets persistent cookies, enabling Taboola to recognize and track returning visitors across extended time periods and multiple browsing sessions.

160. The privacy violations Plaintiff Apaydin suffered are not confined to Plaintiff's visits to Petco.com and Apartments.com but continue to the present day.

161. Taboola's identity graph retains Plaintiff's identity profile, which remains linked (through the deterministic and probabilistic matching techniques described above) to Plaintiff's personal information, content consumption, and browsing activity.

162. This profile continues to be updated each time Plaintiff visits any website in Taboola's network of tracked domains—spanning, on information and belief, thousands of publisher and consumer websites—with each new interaction added to Plaintiff's permanent surveillance record.

163. The information Taboola transmitted to third parties cannot be recalled or deleted by Taboola. Once Plaintiff's data entered the systems of the DSPs, SSPs, ad networks, exchanges, and data buyers to which Taboola distributes audience data, it became incorporated into those parties' user profiles, algorithmic models, and targeting databases.

164. The harm cannot be undone: even if Taboola ceased operations, those third parties would retain Plaintiff's information in their own systems indefinitely, continuing to use it to target advertisements and draw inferences about Plaintiff's characteristics.

165. This ongoing harm flows directly from Taboola's initial interception and disclosure and constitutes a continuing invasion of Plaintiff's privacy.

***ii. Plaintiff Wilce's Experience.***

166. In or around December 2024, Plaintiff Kristy Wilce visited and used the website startwillow.com, a website that deploys Taboola's tracking technology. Startwillow.com is a direct-to-consumer telehealth website through which consumers seek and obtain prescription GLP-1 weight-loss medications.

167. Plaintiff Wilce used the startwillow.com website in or around December 2024 to research and seek prescription GLP-1 medications for weight loss, including by creating an account and submitting personal and health information through the website.

168. During these and subsequent visits, the website invited Plaintiff Wilce to communicate personal information to it, and Plaintiff Wilce did so, including:

a. Plaintiff's name, address, and other personal information, entered to create her account and to place orders;

b. The articles, products, and other content Plaintiff viewed, including page titles, tags, and categories;

c. Plaintiff's payment information and order history, communicated in connection with her orders on the website;

d. Click activity and other interactions with the website's pages; and

e. Plaintiff's health information, including her interest in and request for GLP-1 weight-loss medication and the health-related information she submitted through the website in connection with that request.

169. When Plaintiff Wilce visited startwillow.com and communicated this personal information, Taboola's tracking tools were present on the website and intercepted the contents of Plaintiff's communications with the website.

170. Taboola's identity graph then used the intercepted information, along with other tracking data, to identify Plaintiff and associate this information with Plaintiff's persistent identity profile.

171. As deployed on startwillow.com, the Taboola tracking code captured page views, clicks, and form inputs as Plaintiff submitted them.

172. The tag captured page URLs and content metadata that corresponded to the substance of what Plaintiff was reading and doing on the website, along with behavioral and event-level data transmitted to Taboola's servers in real time.

173. At no time did Plaintiff Wilce consent to Taboola intercepting Plaintiff's communications with startwillow.com.

174. Plaintiff did not have a direct relationship with Taboola and was unaware of Taboola's presence on the website.

175. The startwillow.com privacy policy did not identify Taboola as a recipient of user data.

176. Taboola's data collection runs by default upon page load unless the website operator affirmatively configures otherwise, and on information and belief, startwillow.com did not configure Taboola's optional consent controls or pass Plaintiff's browser privacy signals through to Taboola.

177. Plaintiff therefore had no means of discovering or preventing Taboola's interception, and at no time did Plaintiff consent to Taboola using Plaintiff's personal information for identity resolution, audience classification, or distribution to advertising platforms and data buyers.

178. Taboola subsequently distributed data derived from Plaintiff's intercepted communications to third-party advertising platforms and data buyers through its sync pixels, export beacons, and outbound batch transfers, enabling those parties to target advertisements to Plaintiff based on Plaintiff's browsing activity.

179. Analysis of websites deploying Taboola's tag confirms the operation of its tracking infrastructure.

180. The Taboola tracking code deployed on these websites is loaded using the website operator's unique Taboola account identifier and transmits collected data to Taboola's collection endpoints.

181. Each collection request transmitted to Taboola's servers carries the contents of the data object documented in Taboola's reference guides—including behaviors, page-level content metadata such as article titles and tags, any captured identity data, and third-party identifiers—together with Plaintiff's IP address, user-agent, and the URL of the page being visited.

182. The Taboola tracking code also sets persistent cookies, enabling Taboola to recognize and track returning visitors across extended time periods and multiple browsing sessions.

183. The privacy violations Plaintiff Wilce suffered are not confined to Plaintiff's visits to startwillow.com but continue to the present day.

184. Taboola's identity graph retains Plaintiff's identity profile, which remains linked (through the deterministic and probabilistic matching techniques described above) to Plaintiff's personal information, content consumption, and browsing activity.

185. This profile continues to be updated each time Plaintiff visits any website in Taboola's network of tracked domains—spanning, on information and belief, thousands of publisher and consumer websites—with each new interaction added to Plaintiff's permanent surveillance record.

186. The information Taboola transmitted to third parties cannot be recalled or deleted by Taboola. Once Plaintiff's data entered the systems of the DSPs, SSPs, ad networks, exchanges, and data buyers to which Taboola distributes audience data, it became incorporated into those parties' user profiles, algorithmic models, and targeting databases.

187. The harm cannot be undone: even if Taboola ceased operations, those third parties would retain Plaintiff's information in their own systems indefinitely, continuing to use it to target advertisements and draw inferences about Plaintiff's characteristics.

188. This ongoing harm flows directly from Taboola's initial interception and disclosure and constitutes a continuing invasion of Plaintiff's privacy.

//

//

//

## CLASS ALLEGATIONS

189. Plaintiffs bring this class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following classes (collectively, the "Classes," each a "Class"):

**Nationwide Class:**

All natural persons located in the United States whose electronic communications were captured by Taboola's tracking code.

**California Sub-Class:**

All natural persons residing in California whose electronic communications were captured by Taboola's tracking code.

190. Excluded from the Classes are the following individuals: officers and directors of Taboola and its parents, subsidiaries, affiliates, and any entity in which Taboola has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

191. Plaintiffs reserve the right to modify or amend the definition of each of the proposed Classes before the Court determines whether certification is appropriate.

192. The putative Classes satisfy the requirements of Federal Rule of Civil Procedure 23:

a. Each class is so numerous that joinder of all members is impracticable. Upon information and belief, Class members number in the millions.

b. There are questions of law or fact common to the Classes, including: (1) whether Taboola's tracking code intercepts the contents of electronic communications; (2) whether Taboola collected, used, and disclosed the contents of those communications without consent; (3) whether Taboola's practices constitute an invasion of privacy; (4) whether Taboola was unjustly enriched; and (5) whether injunctive relief should issue.

c. Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs and Class members did not consent to Taboola's interception and collection of their communications and personal information.

d. Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests do not conflict with the interests of Class members, and Plaintiffs have retained competent counsel experienced in class action and privacy litigation.

e. Taboola has acted on grounds generally applicable to the Classes, making final injunctive relief and declaratory relief appropriate with respect to the Classes as a whole.

## TOLLING, CONCEALMENT, AND ESTOPPEL

193. The applicable statutes of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein.

194. Defendant affirmatively hid its true actions and knowingly made statements that were misleading and concealed the true nature of its conduct and operation.

195. Specifically, Taboola publicly represented that it processes personal data only where it has a lawful basis to do so, claiming, for example, that it obtains consumer consent, or asks its partners to obtain consent on its behalf, where required by applicable data protection laws, and marketed its tools as privacy-respecting, featuring an opt-out of the sale or sharing of personal data and compliance with the GDPR, the CCPA, and the IAB Transparency and Consent Framework. [67]

196. These representations were misleading because, as alleged above, Taboola collected and monetized consumers' data without their knowledge or valid consent, while contractually shifting the responsibility for obtaining any consent onto the website operators whose visitors it surveilled.

---

[67] *Privacy Policy, supra* n. 20, § 5.1.2 ("Legal Basis for Processing Personal Data"); id. (Privacy Self-Regulation) (Taboola "participates in the IAB Europe Transparency & Consent Framework and complies with its Specifications and Policies as vendor number 42"); § 2.4 (User Choices) (stating that consumers may "opt-out of the sale or sharing of your personal data" through Taboola's data subject access request portal).

197. The circumstances and nature of Taboola's data collection would lead reasonable users to believe that Taboola was not collecting their information or that website operators were not facilitating disclosure of the same.

198. Moreover, Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part.

199. Furthermore, under the circumstances Defendant was under a duty to disclose the true character, quality, and nature of its activities to Plaintiffs. Defendant therefore is estopped from relying on any statute of limitations.

200. All applicable statutes of limitations also have been tolled by operation of the discovery rule. Specifically, Plaintiffs and other Class members could not have learned through the exercise of reasonable diligence of Defendant's conduct as alleged herein.

201. Accordingly, Plaintiffs and the Class members could not have reasonably discovered the truth about Defendant's practices until shortly before this class litigation was commenced.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
**18 U.S.C. § 2510, *et seq.***
***<u>(On Behalf of Plaintiffs & the Nationwide Class</u>)***

202. Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

203. Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class against Taboola.

204. The ECPA protects both the sending and receipt of communications.

205. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

206. A violation of the ECPA occurs where any person:

> [I]ntentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication [or] intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication [or] intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication.

18 U.S.C. §§ 2511(1)(a), (c)-(d).

207. "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

208. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

209. "Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

210. Whenever Plaintiffs and Class members transmitted electronic communications to websites where Taboola's tracking code was installed, Taboola, through the tracking code it deployed on the website, contemporaneously and intentionally intercepted the contents of Plaintiffs' and Class members' electronic communications while those communications were in transmission, and redirected such contents to Taboola's servers and subsequently to third parties through Taboola's sync pixels, export beacons, and outbound data transfers.

211. Taboola intentionally intercepted and used the contents of Plaintiffs' and Class members' electronic communications for unauthorized purposes including disclosing and, on information and belief, profiting from Plaintiffs' and Class members' communications by transmitting the contents to third parties for marketing analytics and behavioral targeting purposes.

212. Plaintiffs and Class members did not authorize Taboola to acquire the content of their communications for purposes of sharing the personal information contained therein with advertising platforms and other third parties.

213. Taboola intercepted Plaintiffs' and Class members' electronic communications without authorization or consent, knowing or having reason to know that the electronic communications contained personal information.

214. The intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class members regarding their reading and browsing activity, shopping habits, consumption of media, geolocation, and many more.

215. This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

216. By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

217. Defendant intentionally intercepted the contents of Plaintiffs' and Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, and other state wiretapping and data privacy laws, among others.

218. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

219. The ECPA's crime-tort exception applies where the communication is intercepted for the purpose of a criminal or tortious act independent of the interception itself. Here, as alleged above, "[t]he association of Plaintiff's data with preexisting user profiles is a further use of Plaintiff's data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Marden v. LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

220. As a direct and proximate result of Taboola's violation of the ECPA, Plaintiffs and Class members were damaged by Taboola's conduct in that:

a. Taboola harmed Plaintiffs' and Class members' interest in privacy;

b. Sensitive and confidential information that Plaintiffs and Class members intended to remain private is no longer confidential;

c. Taboola took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value; and

d. Taboola's actions diminished the value of Plaintiffs' and Class members' personal information.

221. Plaintiffs, individually and on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### INVASION OF PRIVACY
### Cal. Const. Art. I § 1
### *(On Behalf of Plaintiffs & the California Sub-Class)*

222. Plaintiffs incorporate by reference all preceding paragraphs.

223. Plaintiffs bring this claim on behalf of the California Sub-Class.

224. Article I, Section 1 of the California Constitution provides that all people have inalienable rights including the right to privacy.

225. This constitutional privacy right was added by voters in 1972 specifically to address concerns about "the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society." *See White v. Davis*, 13 Cal. 3d 757, 774 (1975).

226. Plaintiffs and the California Sub-Class members maintain a reasonable expectation of privacy in their electronic communications with websites, including communications containing their sensitive personal, financial, and consumer information.

227. This expectation of privacy is particularly strong with respect to information that consumers intend to share only with the website they are visiting, such as health information, credit card details, and personal identifying information.

228. Taboola, in violation of Plaintiffs' and the California Sub-Class members' reasonable expectation of privacy, intercepts, collects, tracks, and compiles their internet activity and communications, and uses its identity graph to resolve their identities and create persistent surveillance profiles without their consent.

229. Taboola's conduct is highly offensive to a reasonable person and constitutes an egregious breach of social norms.

230. Taboola secretly intercepts sensitive communications—including personal, financial, and health information—that individuals reasonably expect to

remain confidential between themselves and the websites they are visiting, then uses sophisticated technology to identify those individuals and track them across the internet.

231. Plaintiffs and the California Sub-Class members have been damaged by Taboola's invasion of their privacy and are entitled to just compensation and injunctive relief.

## THIRD CAUSE OF ACTION

## INTRUSION UPON SECLUSION

***(On Behalf of Plaintiffs & the Nationwide Class, or in the alternative on behalf of Plaintiff Apaydin & the California Sub-Class)***[68]

232. Plaintiffs incorporate by reference all preceding paragraphs.

233. To state a claim for intrusion upon seclusion under California common law, a plaintiff must allege (i) intrusion into a private place, conversation, or matter, and (ii) in a manner highly offensive to a reasonable person.

234. Plaintiffs and Class members had an objectively reasonable expectation of privacy in their electronic communications with the websites they visited—including communications containing their personal identifying information, financial information, purchase histories, browsing activity, form submissions, and

---

[68] *See* Fed.R.Civ.P. 8(d)(2)–(3) (permitting a party to set out claims alternatively or hypothetically and to state as many separate claims as it has, regardless of consistency). Plaintiff pleads the Third Cause of Action on behalf of the Nationwide Class and, in the alternative, on behalf of Plaintiff and the California Sub-Class. To the extent the forum's choice-of-law rules require application of the privacy-tort law of individual Class members' home jurisdictions, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 590 (9th Cir. 2012) (California applies a governmental interest analysis to choice-of-law questions), any resulting variation in state law bears on class certification under Rule 23 and does not defeat the claim at the pleading stage.

records of the content they viewed and read, from which sensitive personal characteristics can be inferred.

235. Consumers reasonably expect that the contents of their communications with a website remain between themselves and that website, and that an undisclosed third-party data management platform is not silently intercepting, recording, and profiling those communications in real time.

236. Taboola intentionally intruded upon Plaintiffs' and Class members' private affairs by deploying tracking code that secretly intercepted the contents of their communications with the websites they visited, identified them through Taboola's identity graph tracking operations, and compiled persistent surveillance profiles linking their activity across Taboola's network of, on information and belief, thousands of websites.

237. Taboola's data collection runs by default upon page load, its consent and Global Privacy Control mechanisms operate only if separately configured by each website operator, and Taboola provides consumers no notice of its presence and no direct means of refusal—ensuring that Plaintiffs and Class members had no practical means of detecting or preventing the intrusion.

238. Taboola's intrusion was highly offensive to a reasonable person and constitutes an egregious breach of social norms.

239. Taboola covertly intercepted sensitive personal, financial, and behavioral information that Plaintiffs and Class members reasonably expected to share only with the websites they were visiting, operating invisibly under a domain name no reasonable consumer would recognize while defaulting to collection regardless of the privacy preferences those consumers attempted to employ.

240. Taboola then exploited that intercepted information for its own commercial benefit and disclosed it to advertising platforms through Taboola's sync

pixels, export beacons, and outbound data transfers, compounding the intrusion.

241. At no time did Plaintiffs or Class members consent to Taboola's interception of their communications, identification through Taboola's identity graph, or disclosure of their information to advertising platforms.

242. As a direct and proximate result of Taboola's intrusion, Plaintiffs and Class members have suffered injury, including loss of privacy, loss of control over their personal information, and the continuing harm of having their personal information disclosed to and retained by third-party advertising platforms in a manner that cannot be undone.

243. Plaintiffs and Class members are entitled to damages, including nominal, compensatory, and punitive damages, as well as injunctive and declaratory relief.

**FOURTH CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
***(On Behalf of Plaintiffs & the California Sub-Class)***

244. Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

245. Plaintiffs bring this claim individually and on behalf of the California Sub-Class.

246. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.

247. The Act begins with its statement of purpose: "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping on private communications and the invasion of privacy resulting from the continual and increasing use of such

devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

248. California Penal Code § 631(a) establishes liability for any person who:

> [I]ntentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> or
>
> [W]illfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state,
>
> or
>
> [U]ses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> or
>
> [A]ids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

249. A defendant must show it had the consent of all parties to the communication. Defendant intercepted Plaintiffs and the members of the subclass without the requisite consent

250. Defendant attempted to read or learn, and/or did read or learn, some meaning of the content in the communications including without limitation in the URLs, search queries, and other content described herein exchanged between the California Class members and the websites that implemented Taboola's tracking code.

251. At all relevant times, Plaintiffs were physically located in California when accessing and using petco.com, apartments.com, and startwillow.com.

252. Plaintiffs' communications with the websites at issue, including form submissions, input of personal information, and interactions with the websites' interfaces, constitute the content of communications within the meaning of CIPA.

253. Through its tracking code and identity graph technology deployed on Petco.com, Apartments.com, Willow Health, and other websites, Taboola intentionally intercepted Plaintiffs' electronic communications in real time as they were transmitted.

254. Taboola's tracking code constitutes unauthorized connections to a wire, line, cable, or instrument and are devices capable of intercepting communications within the meaning of Cal. Penal Code § 631, as it is specifically designed to capture, copy, and transmit user communications as they occur and while they are in transit between the user's device and Defendant's servers. Taboola's tracking code constitutes a device capable of intercepting electronic communications within the meaning of CIPA, as it is specifically designed to capture, record, and transmit user interactions and data inputs as they occur. Taboola's tracking code constitutes a "machine[s], instrument[s], or contrivance[s]" under the CIPA, and, even if they do not, the tracking technology provided falls within the broad catch-all category of "any other manner"

255. On information and belief, Taboola intercepts communications through electronic devices and servers located in California, and/or the tracking originated in and was executed in California, and/or intercepted the communications of Plaintiffs and California Sub-Class members while those users were physically located in California.

256. Taboola's interception of Plaintiffs' and Sub-Class members' electronic communications was accomplished without their consent. Specifically:

a. Taboola never obtained express consent from Class members before intercepting their communications;

b. Websites where Taboola is present begin tracking users immediately, and some invite users to submit personal information through forms, quizzes, or account-creation flows before they have any opportunity to review any privacy policies;

c. Taboola's tracking and interception begin immediately upon visiting pages where it is present, before any opportunity for users to provide informed consent;

d. Taboola never provided clear, conspicuous notice that users' electronic communications containing personal information would be intercepted and transmitted to Taboola's servers and shared with advertising platforms; and

e. Any purported consent was ineffective because Taboola's interception began before consent could be obtained and because users were never informed of Taboola's role in intercepting their communications.

257. The intercepted communications include highly sensitive personal information that Plaintiffs and California Sub-Class members provided with reasonable expectations of privacy and confidentiality, including:

a. Email addresses and other personal identifiers;

b. The articles, products, and other content they viewed—including page titles, tags, and categories from which sensitive characteristics, such as health concerns, financial circumstances, or political and religious interests, can be inferred;

c. Responses to forms, quizzes, and preference selections;

d. Behavioral and event-level interaction data, including clicks and interactions with page features; and

e. Other personal and financial information including names, addresses, credit card details, and purchase history.

258. Taboola's conduct was willful and intentional, as Taboola deliberately deployed tracking technology knowing it would intercept users' electronic communications without proper consent.

259. As a direct and proximate result of Taboola's violations of CIPA, Plaintiffs and Sub-Class members have suffered injury, including invasion of

privacy, loss of confidentiality of personal information, and violation of their statutory rights.

260. Plaintiffs and Sub-Class members continue to desire to use the internet for healthcare, e-commerce, and other purposes but have a reasonable fear that their electronic communications will continue to be intercepted by Taboola without consent.

261. Under Cal. Penal Code § 637.2, Plaintiffs and Sub-Class members are entitled to:

a. $5,000 per violation;

b. Punitive damages;

c. Reasonable attorneys' fees and other litigation costs reasonably incurred; and

d. Such preliminary and other equitable or declaratory relief as may be appropriate.

262. Unless enjoined by this Court, Taboola will continue to intercept the electronic communications of Plaintiffs, Sub-Class members, and other website visitors without their consent, causing irreparable harm for which there is no adequate remedy at law.

## FIFTH CAUSE OF ACTION

## VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
**Cal. Penal Code § 632**
***(On Behalf of Plaintiffs & the California Sub-Class)***

263. Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

264. Plaintiffs bring this claim individually and on behalf of the members of the California Sub-Class against Taboola.

//

265. California Penal Code § 632(a) provides that "[e]very person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished[.]"

266. California Penal Code § 632(c) defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, or other public proceeding in which the public is entitled to attend, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

267. The communications between Plaintiffs and Sub-Class members and websites where sensitive data is transmitted, such as Petco.com and Apartments.com, constitute "confidential communications" within the meaning of § 632(c) because:

a. they were made in the context of private consumer transactions and personal browsing involving sensitive personal and financial information;

b. users had a reasonable expectation that their communications with the websites they visited—including personal identifying information, financial details, and records of the content they viewed—would remain confidential;

c. the sensitive nature of the information communicated—including content-consumption records, payment details, and personal identifying information—inherently indicates a desire for confidentiality; and

d. users were not informed that their communications would be recorded and shared with third parties like Taboola.

268. Taboola intentionally used an electronic recording device, including tracking code and identity graph technology deployed on websites including Startwillow.com, petco.com and apartments.com, to eavesdrop upon and record these confidential communications.

269. Taboola's tracking code constitutes an "electronic amplifying or recording device" within the meaning of § 632(a) because it is specifically designed to capture, record, and transmit user interactions and communications in real time for analytics and behavioral tracking purposes.

270. Taboola intentionally deployed this recording technology on publisher, e-commerce, and other consumer websites with full knowledge that it would capture and record users' confidential communications, including their personal information, financial details, and records of the content they viewed and read.

271. Taboola's recording of Plaintiffs' and California Sub-Class members' communications was accomplished without the consent of all parties to the communication, specifically:

a. Plaintiffs and California Sub-Class members never consented to having their confidential communications recorded by Taboola;

b. Taboola never obtained express consent before recording their communications;

c. Users were not informed that their communications would be recorded and transmitted to Taboola's servers and then shared with third-party advertising platforms and data buyers through Taboola's sync pixels, export beacons, and outbound data transfers;

d. No clear, conspicuous notice was provided regarding the scope and nature of Taboola's recording of confidential communications; and

e. The recording begins immediately upon accessing websites where the Taboola tracking code is installed, before users have any opportunity to review privacy policies or provide informed consent.

//

//

//

272. Taboola's conduct was undertaken intentionally and with knowledge that its tracking code would record confidential communications without proper consent from all parties.

273. The confidential communications that were unlawfully recorded include highly sensitive personal, financial, and health information that individuals provided with reasonable expectations of confidentiality.

274. As a direct and proximate result of Taboola's violations of Section 632, Plaintiffs and Sub-Class members have suffered harm including invasion of their privacy rights, violation of confidentiality, and loss of control over their sensitive personal information.

275. Unless enjoined and restrained by this Court, Taboola will continue to commit these violations. Plaintiffs and Sub-Class members have a reasonable fear that their confidential communications will continue to be unlawfully recorded by Taboola.

276. Pursuant to California Penal Code § 637.2, Plaintiffs and Sub-Class members are entitled to:

a. A preliminary and permanent injunction prohibiting Taboola from continuing its unlawful recording of confidential communications;

b. Statutory damages of $5,000 per violation;

c. Punitive damages for Taboola's willful and egregious violations of privacy; and

d. Such other relief as the Court deems proper.

277. Plaintiffs and Sub-Class members seek all available remedies under California Penal Code § 632 and related provisions for Taboola's unlawful recording of confidential communications.

//

//

## SIXTH CAUSE OF ACTION

## VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
## CAL. PENAL CODE § 638.51
***(On Behalf of Plaintiffs & the California Sub-Class)***

278. Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

279. Plaintiffs bring this claim individually and on behalf of the members of the California Sub-Class against Taboola.

280. California Penal Code § 638.51(a) provides that, except in circumstances not present here, "a person may not install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53."

281. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

282. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

283. Software that identifies consumers and gathers and correlates data about them is a "process" within these definitions. *See Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) ("a private company's surreptitiously embedded software" that "identifies consumers, gathers data, and correlates that data through unique 'fingerprinting'" can be a pen register); *Moody v. C2 Educational Systems Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) (allegations that tracking

software embedded in a website collects information from visitors "plausibly fall within the scope of §§ 638.50 and 638.51").

284. As alleged above, Taboola's tracking code is a "pen register" within the meaning of § 638.50(b): it is a process that records and decodes routing, addressing, and signaling information—including but not necessarily limited to Plaintiffs' and Sub-Class members' network headers, IP addresses, identifiers for their browsers and devices, the web addresses of the pages they visited and the pages that referred them there, and the unique Taboola ID assigned to each of them—transmitted from the browsers and devices from which their electronic communications were sent.

285. Taboola's tracking code likewise functions as a "trap and trace device" within the meaning of § 638.50(c): deployed across the websites in Taboola's network, it captures incoming electronic impulses—including but not necessariliy limited to, network headers, IP addresses, device and browser identifiers, and Taboola's own cookies and stored identifiers—that identify the source of the communications those websites receive from visitors, and Taboola uses that information to identify each visitor.

286. Taboola installed and used, or aided website operators in installing and using, these pen registers and trap and trace devices on, on information and belief, thousands of websites, including Startwillow.com, petco.com and apartments.com, and thereby captured routing, addressing, and signaling information identifying Plaintiffs and California Sub-Class members and the sources of their communications.

287. Taboola never obtained a court order pursuant to § 638.52 or § 638.53—or any other judicial authorization—before installing or using these devices and processes.

288. Taboola is not a provider of electronic or wire communication service entitled to any exception under § 638.51(b), and no such exception applies to its

conduct. Nor did Plaintiffs or the California Sub-Class members consent to Taboola's installation or use of a pen register or trap and trace device on their communications.

289. As a direct and proximate result of Taboola's violations of § 638.51, Plaintiffs and Sub-Class members have suffered injury, including invasion of their statutorily protected privacy interests and loss of control over information that identifies them and the sources of their communications.

290. Under Cal. Penal Code § 637.2, Plaintiffs and Sub-Class members are entitled to statutory damages of $5,000 per violation or three times the amount of any actual damages sustained, injunctive relief, and such other and further relief as the Court deems proper. It is not a necessary prerequisite to recovery under § 637.2 that Plaintiffs or Sub-Class members have suffered actual damages.

## SEVENTH CAUSE OF ACTION

## UNJUST ENRICHMENT
***(On Behalf of Plaintiffs & the Nationwide Class)***

291. Plaintiffs incorporate by reference all preceding paragraphs.

292. Taboola has wrongfully and unlawfully intercepted and used Plaintiffs' and Class members' personal information, including sensitive health information, for commercial gain without consent.

293. Plaintiffs and Class members conferred a benefit upon Defendant by providing valuable information, including purchase histories, browsing histories, sensitive health data, medical histories, and personal identifiers, through their use of websites where Taboola is active.

294. Plaintiffs' and Class members' personal information has conferred an economic benefit on Taboola. Taboola has profited by using intercepted data in its identity graph and by sharing identity-resolved consumer profiles with advertising

platforms through Taboola's sync pixels, export beacons, and outbound data transfers.

295. It would be inequitable and unjust for Taboola to retain any proceeds from its unlawful conduct. Plaintiffs and Class members are entitled to restitution and disgorgement of all revenues, earnings, profits, and other benefits obtained by Taboola as a result of its unlawful conduct.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs Nicki Apaydin and Kristy Wilce, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment against Defendant Taboola, Inc. and in favor of Plaintiff and the Classes, and grant the following relief:

A. Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Appoint Plaintiff as Class Representative;

C. Appoint undersigned counsel as Class Counsel;

D. Enter judgment in favor of Plaintiffs and Class members against Taboola awarding damages, including statutory damages, punitive damages, and nominal damages;

E. Enter judgment in favor of Plaintiffs and Class members awarding restitution and disgorgement of Taboola's revenue obtained through unlawful tracking;

F. Enter a declaratory judgment that Taboola's conduct violates the laws alleged herein;

G. Permanently restrain Taboola from intercepting, tracking, collecting, or compiling the personal information of Plaintiffs and Class members without consent;

H. Award Plaintiffs and Class members their reasonable costs and expenses, including attorneys' fees; and

I. Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: August 31, 2026

Respectfully Submitted,

*/s/ Victor J. Sandoval*
Victor J. Sandoval
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd. Suite 1121
Los Angeles, California 90034
(562) 534-5907
victor@almeidalawgroup.com

*Counsel for Plaintiffs and the Putative Classes*